**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHAO YU,<br><br>Plaintiff,<br><br>v.<br><br>SHEN YUN PERFORMING ARTS, INC.; THE EPOCH TIMES ASSOCIATION, INC.; UNIVERSAL COMMUNICATIONS NETWORK, INC. d/b/a NEW TANG DYNASTY TELEVISION; FALUN DAFA INFORMATION CENTER, INC.; DRAGON SPRINGS BUDDHIST, INC.; GEORGE XU; JONATHAN LEVI BROWDE; and ERPING ZHANG,<br><br>Defendants. | Civil Action No. 3:26-cv-30153<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Chao Yu ("Mr. Yu" or "Plaintiff"), by his attorneys, as and for his First Amended Complaint against Defendants Shen Yun Performing Arts, Inc. ("Shen Yun"); The Epoch Times Association, Inc. ("The Epoch Times"); Universal Communications Network, Inc. d/b/a New Tang Dynasty Television ("NTD"); Falun Dafa Information Center, Inc. (the "Information Center"); George Xu ("Xu"); Jonathan Levi Browde ("Browde"); Erping Zhang ("Zhang"); and Dragon Springs Buddhist, Inc. ("Dragon Springs") (together, "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1. This is a case of retaliatory defamation. Defendants are affiliated with the religious movement Falun Gong. Plaintiff Chao Yu is a former member of that movement whom Defendants once lauded as a hero. Defendants turned on him when he refused to ignore repeated accounts of

human rights abuses at Shen Yun, a performing arts organization affiliated with Falun Gong. They sought to destroy his reputation—and thus his credibility—by recasting this hero as a dangerous villain working for the movement's mortal enemy.

2. Mr. Yu spent close to ten years in Chinese prisons because, at the height of the Chinese Communist Party's ("CCP") violent suppression of the Falun Gong new religious movement, he built the encrypted communications channels that allowed Western journalists to interview persecuted Falun Gong practitioners inside China and share their stories with the world. He was tortured for it. He lost his career, his youth, and his son's childhood.

3. After his release, Mr. Yu emigrated to the United States, received asylum, and became a citizen. For years, Falun Gong-affiliated organizations celebrated him. The Epoch Times published a lengthy 2013 profile of his sacrifice, and he was the principal subject of a four-part documentary broadcast by NTD recounting his underground work and imprisonment. He developed a popular YouTube channel. He was well known in the community as a man who had given nearly everything for it.

4. That changed when Mr. Yu began asking questions about the treatment of the young performers of Shen Yun Performing Arts, many of them children. Beginning in about 2017, former Shen Yun performers brought Mr. Yu firsthand accounts of abuse, indoctrination, coercion, exploitation, psychological manipulation, lasting trauma, and suicide attempts. He raised his concerns privately and was told to keep quiet.

5. On August 9, 2023, Mr. Yu reported Shen Yun to the National Human Trafficking Hotline. Around the same time, Mr. Yu submitted a written request to the FBI that it should investigate Shen Yun. And on August 16, 2023, he published, for the first time, a program presenting accounts that Shen Yun confined and mistreated the children in its care.

6. Mr. Yu did this to protect the civil rights of Shen Yun's performers: each has the right to be free from forced labor, involuntary servitude, and human trafficking, while the many child performers also have the right to be free from abuse, neglect, and unlawful child labor. Based on his whistleblowing and its own subsequent investigations, The New York Times published eleven articles and a podcast on Shen Yun's potential mistreatment of its performers and on the inner operations of Falun Gong. Several former child performers have filed lawsuits alleging that Shen Yun exploited them as minors.

7. Shen Yun's response was an organized campaign to destroy Mr. Yu's reputation. On August 31, 2023, fifteen days after he publicly exposed the mistreatment, persons associated with Defendants were asking practitioners where Mr. Yu lived. Mr. Yu, who had survived nearly a decade of imprisonment and torture in China for this same movement, feared for his life and fled the state. Within days, Shen Yun brought accusations against Mr. Yu to the FBI. The Epoch Times, the Falun Gong movement's flagship media outlet, soon reported, quoting a Shen Yun representative, that "[t]he FBI has been notified and is investigating the threats."

8. On September 7, 2023, the FBI issued an internal "Officer Safety" bulletin concerning Mr. Yu (the "Bulletin"), reciting, "[a]ccording to our information," that Mr. Yu "has made threats to the Dragon Springs campus," had been "confirmed in the area on 9/1/2023," claimed he "wanted to be on a 'suicide squad,'" and was "potentially armed and dangerous." The Bulletin was a law-enforcement-sensitive document, not a public record and not the product of any completed FBI investigation, and it instructed its recipients not to act on it alone.

9. The Bulletin's recitals were false. Mr. Yu never threatened to harm anyone. The "suicide squad" quotation was an English rendering, stripped of its context, of a Chinese idiom he had used about his own readiness to keep speaking at whatever cost to himself; in the same

programs he expressly said he wanted the law to expose Shen Yun's wrongdoing and sought the help of the authorities in doing so. On September 1, 2023, Mr. Yu was in Massachusetts and then on a train to Ohio, never closer than roughly ninety miles to Shen Yun's campus, and it was he who then called the police.

10. On September 8, 2023, armed federal agents and local police arrived at Mr. Yu's home to question him in connection with the Bulletin. The ensuing search and seizure, built on the Bulletin, spawned a Massachusetts firearms-licensing prosecution that consumed nearly three years of Mr. Yu's life. The prosecution was eventually resolved without a conviction after the Commonwealth abandoned the most serious charges against Mr. Yu. The remaining charges were strict liability misdemeanors that were continued without a finding for six months and ultimately dismissed on June 18, 2026. Mr. Yu's application for a Massachusetts License to Carry, filed twelve days before the Bulletin, was denied in express reliance on it.

11. Defendants then spent years mining the Bulletin as purported "proof" that Mr. Yu was a violent threat and a foreign agent, while concealing that the Bulletin's accusations had originated with Shen Yun, that the FBI had questioned Mr. Yu and taken no action, and that the criminal case concerned only firearms licensing and ended without a conviction. The Epoch Times published article after article repeating that Mr. Yu had threatened Shen Yun, had been confirmed near its campus, had been "arrested." None of those assertions was true.

12. The movement's press office reported that he "may be acting as a foreign agent of the CCP," a report Shen Yun itself adopted and promoted in its own official statements. And in March 2026, Defendant NTD released a feature-length film, *Unbroken*, marketed as a "True Crime Documentary" and screened from film festivals to Capitol Hill, in which Shen Yun's own master of ceremonies told the world that Mr. Yu "was spying around campus," "talked about having a

suicide squad and about violence against our community," and "was seen walking around our headquarters."

13. Mr. Yu brings this action to hold Defendants accountable for the false statements that made up that campaign, and for the devastating professional, financial, physical, and emotional harm those statements have caused. He brings it also because the campaign was retaliation for protected activity undertaken to protect the civil rights of Shen Yun's performers, and because retaliation of that kind, if it succeeds, silences not only the person it targets but everyone who might otherwise come forward.

**PARTIES**

14. Plaintiff Chao Yu is a natural person and a citizen of the Commonwealth of Massachusetts, residing in Williamstown, Berkshire County, Massachusetts. He is a naturalized United States citizen. Like many Chinese immigrants, he adopted an English nickname that he has used from time to time: Charles Hugo.

15. Defendant Shen Yun Performing Arts, Inc. ("Shen Yun") is a New York not-for-profit corporation with its principal place of business at 140 Galley Hill Road, Cuddebackville, New York, on the campus known as Dragon Springs. Shen Yun is the performing-arts enterprise founded and controlled by leaders of the Falun Gong movement. Its performers train, rehearse, and live at the Dragon Springs campus; many are minors or young adults.

16. Defendant The Epoch Times Association, Inc. ("The Epoch Times") is a New Jersey not-for-profit corporation with its principal place of business in New York, New York. It publishes The Epoch Times newspaper and its associated websites and digital platforms in 21 languages and 35 countries and regions, and distributes local print editions in United States cities including the Boston area. Every page of its website bears the notice "Copyright © 2000 – 2026

The Epoch Times Association Inc," identifying that entity as the publisher and owner of the content at issue. On information and belief, The Epoch Times operates in coordination with a network of affiliated Epoch-branded entities under common control. The Epoch Times was founded by, and is operated by, Falun Gong practitioners; it operates as an affiliated organ of the Falun Gong movement and in coordination with Shen Yun, whose performances it extensively promotes.

17. Defendant Universal Communications Network, Inc., d/b/a New Tang Dynasty Television ("NTD"), is a New Jersey not-for-profit corporation with its principal place of business in New York, New York. NTD is a television and digital broadcaster founded by, and operated by, Falun Gong practitioners. NTD operates as an affiliated organ of the Falun Gong movement and in coordination with Shen Yun and The Epoch Times, with which it shares affiliation under a common media group. NTD produced and broadcast the documentary film *Unbroken* described herein.

18. Defendant Falun Dafa Information Center, Inc. is a New York not-for-profit corporation with, on information and belief, its principal place of business in Otisville, New York, near the Dragon Springs campus. The Information Center is the press office of the Falun Gong movement and acts in coordination with and on behalf of Shen Yun, which has adopted, invoked, and republished the Information Center's reports concerning Plaintiff in its own official statements. The Information Center authored and published the reports and statements concerning Plaintiff described herein, including its August 7, 2024 report and its December 2024 publication.

19. Defendant Dragon Springs Buddhist, Inc. ("Dragon Springs") is a New York not-for-profit corporation with its principal place of business at 140 Galley Hill Road, Cuddebackville, New York. Dragon Springs owns and operates the campus of the same name on which Shen Yun trains, rehearses, and houses its performers; by Dragon Springs' own account in litigation

concerning the campus, the campus contains "facilities provided to Shen Yun Performing Arts." Dragon Springs operates in close coordination with Shen Yun concerning the campus and its security, and it acted concerning Plaintiff through its officers as alleged herein: its President, Defendant Xu, and Defendant Browde, who affirmed in a September 16, 2022 affidavit that he serves as Vice President of Dragon Springs' planning office.

20. Defendant George Xu, who also uses the names Zhene Xu and Zhen Xu, is a natural person and a resident of the State of New York. Xu is, and at all relevant times has been, the President of Defendant Dragon Springs. The Information Center has itself publicly identified "Dr. George Xu" as Dragon Springs' President. Xu has likewise acted as a spokesman and agent for Shen Yun in matters concerning the campus and its security, including by speaking to the press on Shen Yun's behalf about Plaintiff's purported threat to the campus and about the "individuals the [New York] Times is interviewing" for its reporting on Shen Yun, and Shen Yun has adopted and republished his statements as its own.

21. Defendant Jonathan Levi Browde is a natural person and, on information and belief, a resident of the State of New York or New Jersey. At all relevant times, Browde has been the Executive Director of Defendant Information Center, the press office of the Falun Gong movement, which acts in coordination with and on behalf of Shen Yun. Browde is also a trustee of Fei Tian College, the institution that trains Shen Yun's performers, and has served as Vice President of the planning office of Defendant Dragon Springs, as a manager of Shen Yun's promotional activities in Westchester County, New York and as a spokesman for NTD. Browde authored, approved, and published statements concerning Plaintiff described herein and personally presented the Bulletin concerning Plaintiff to a public audience on December 18, 2024.

22. Defendant Erping Zhang ("Zhang") is a natural person and, on information and belief, a resident of the State of New Jersey. At all relevant times, Zhang has been a longtime spokesman for the Falun Gong movement and its interests, including Shen Yun, and, on information and belief, a senior leader of the movement and of the Falun Dafa Association, its umbrella organization in the United States. According to the Information Center's own published staff listing, Zhang serves as its Director of Government and Advocacy. On information and belief, Zhang serves as a channel through which directives of the movement's founder, Li Hongzhi, are communicated to the movement's practitioners and media figures and enforced. As alleged herein, on September 2 and 3, 2023, Zhang ordered a journalist, Simone Gao, to delete her published interviews of Plaintiff from the internet, stating that the order came from Li Hongzhi. On information and belief, Zhang

**JURISDICTION AND VENUE**

23. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Massachusetts. Each Defendant is a citizen of New York or New Jersey, as alleged above. The amount in controversy exceeds $75,000, exclusive of interest and costs.

24. This Court has personal jurisdiction over each Defendant because each directed the conduct at issue into Massachusetts. On or about August 31, 2023, persons acting in concert with Defendants hunted for the Massachusetts home address of a man they knew to be a Massachusetts resident. In the days that followed, Shen Yun, on information and belief, identified Plaintiff to the FBI by his Williamstown, Massachusetts home address and his Massachusetts license plate, in a report made with the knowledge and intent that law enforcement would act on it in Massachusetts. The resulting Bulletin issued September 7, 2023 included the statement that Mr. Yu was a Massachusetts resident. The Massachusetts State Police Fusion Center rebroadcast the Bulletin to

Massachusetts police departments, including Williamstown's. On September 8, 2023, armed officers came to Plaintiff's Massachusetts home, which was searched under a Massachusetts warrant obtained on the basis of an affidavit citing the Bulletin; and Plaintiff was then prosecuted in Massachusetts courts. The publications that followed took the Massachusetts search, seizure, charges, and prosecution as their centerpiece, were distributed and read in Massachusetts, and inflicted their injury—reputational, professional, financial, physical, and emotional—in Massachusetts, where the injury continues.

25. Jurisdiction is proper under Federal Rule of Civil Procedure 4(k)(1)(A) and under the Massachusetts long-arm statute, G.L. c. 223A, § 3, including § 3(a) (transacting business in the Commonwealth), § 3(c) (causing tortious injury by an act or omission in the Commonwealth, including the transmission of false statements into the Commonwealth to Massachusetts law enforcement and the distribution of defamatory publications within the Commonwealth), and § 3(d) (causing tortious injury in the Commonwealth by acts outside it while regularly doing or soliciting business in, engaging in a persistent course of conduct in, or deriving substantial revenue from the Commonwealth), and comports with due process.

26. Each entity Defendant maintains suit-related Massachusetts contacts. Shen Yun regularly stages performances in the Commonwealth, including recurring engagements at the Boch Center Wang Theatre in Boston—among them performances in April 2026 and further performances scheduled for December 2026—which it promotes to Massachusetts residents and from which it derives substantial revenue; its statements about Plaintiff were calculated to protect that Massachusetts audience and market. The Epoch Times regularly circulates its publications in Massachusetts, including a Boston-area print edition and online to Massachusetts subscribers and readers, and the defamatory articles at issue were distributed and read in Massachusetts. NTD

broadcasts and streams its programming into Massachusetts and, since June 2026, has offered *Unbroken* for commercial sale to Massachusetts consumers on Apple TV, Amazon, Google Play, and its own and affiliated platforms, deriving revenue from Massachusetts purchasers of the publication at issue. The Information Center publishes its reports and statements online to a national audience that includes Massachusetts readers; its publications concerning Plaintiff recounted his Massachusetts search, charges, and prosecution and were distributed and read in Massachusetts. Dragon Springs acted through its President, Defendant Xu, and its planning-office Vice President, Defendant Browde, whose Massachusetts-directed statements concerning Plaintiff are described below, and it joined the common design alleged herein, whose overt acts were knowingly and expressly aimed at Massachusetts.

27. The individual Defendants likewise directed their conduct at Massachusetts. Defendant Xu made his statements about Plaintiff to a newspaper he knew circulates in Massachusetts, including in a Boston-area print edition. Defendant Browde publicly displayed the Bulletin, bearing Plaintiff's Massachusetts identifying information and recounted Plaintiff's Massachusetts search and charges, in statements published by the Information Center to a national audience that includes residents of Massachusetts, and authored or approved Information Center reports distributed to Massachusetts readers. Defendant Zhang aimed his conduct at Massachusetts: the object of his September 2023 deletion order, described below, was the erasure of published interviews of a Massachusetts resident, and on information and belief the order issued in furtherance of the same scheme in which its participants were seeking and ultimately transmitting Plaintiff's Massachusetts address to the FBI to punish his whistleblowing and discredit him.

28. In addition, each Defendant knowingly joined the common design alleged herein, in furtherance of which its co-conspirators committed overt acts in and expressly aimed at Massachusetts, including the hunt for Plaintiff's Massachusetts address, the transmission of his Massachusetts address and license plate to the FBI, the foreseeable rebroadcast of the Bulletin by the Massachusetts State Police Fusion Center, and the distribution of the ensuing publications in Massachusetts. Each Defendant is subject to personal jurisdiction on that basis as well.

29. Massachusetts is the center of gravity of this action. Plaintiff lives in Massachusetts; his reputation, community, and professional life are centered in Massachusetts; Defendants directed their search for him, their statements about him, and the foreseeable law-enforcement consequences of those statements into Massachusetts; and every element of his injury was and continues to be suffered in Massachusetts.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and injuries giving rise to the claims occurred in this District, including Defendants' efforts to locate Plaintiff in this District, the dissemination of the Bulletin to Massachusetts law enforcement, the search of Plaintiff's Massachusetts home, the resulting Massachusetts prosecution, and the reputational, professional, and personal harm Plaintiff suffered here.

## FACTS COMMON TO ALL COUNTS

### A. Mr. Yu risked his life and freedom for Falun Gong practitioners in China.

31. Mr. Yu is a 1995 graduate of Tsinghua University, China's premier engineering university, and worked as an information-technology specialist for an international company in Beijing. He began practicing Falun Gong in December 1993.

32. When the Chinese government began its violent suppression of Falun Gong in 1999, Mr. Yu chose to help. He was detained in October 1999 for petitioning the Chinese Ministry of Public Security, and again in April 2000—for approximately thirty-eight days—for displaying a Falun Gong banner in Tiananmen Square. His wife, Chu Tong, was arrested in October 1999 for unfurling a Falun Gong banner on the Tiananmen gate tower itself and served a year and a half in prison.

33. From approximately July 2000 to August 2002, at the height of the persecution and as China's system of internet censorship and surveillance, now known as the "Great Firewall," was first being built, Mr. Yu helped establish and lead a clandestine, encrypted communications network that passed through it. The network enabled persecuted Falun Gong practitioners inside China to document arrests, torture, and deaths, and to transmit that information to the outside world—including to Falun Gong's own overseas organizations and its principal website, Minghui.org.

34. Mr. Yu also personally enabled Western journalists to report the story from behind the Great Firewall. He installed encryption software for reporters, mapped routes to safe houses, trained practitioners in secure communications, and arranged interviews between foreign correspondents and survivors of persecution at a time when both the journalists and their sources faced grave danger.

35. Among the journalists Mr. Yu assisted was Ian Johnson of The Wall Street Journal, whose reporting on the persecution of Falun Gong won the 2001 Pulitzer Prize for International Reporting. Mr. Johnson has said that Mr. Yu's assistance was "absolutely crucial" to that reporting, and that Mr. Yu took great personal risks to provide it. Mr. Yu also assisted correspondents from the Associated Press, The Washington Post, and other international outlets.

36. By May 2000, Chinese public-security authorities had placed Mr. Yu on a nationwide wanted list and designated him a priority target of the Ministry of Public Security. He and his wife were arrested again in August 2002.

37. For nearly two years, Mr. Yu was held in a secret detention facility where he was tortured repeatedly. In April 2004, he was officially sentenced to nine years' imprisonment. In total, he was imprisoned for approximately nine and a half years.

38. The family had been torn apart even before the final arrest: in August 2001, a year before Mr. Yu was taken, he and his wife placed their three-year-old son with a family friend, because neither parent could safely keep him while they were hunted by police. In nearly ten years of imprisonment, Mr. Yu saw his son once, during a single prison visit. When father and son resumed living together upon Mr. Yu's release in February 2012, the boy was thirteen.

39. Mr. Yu was released in February 2012, arrived in New York with his wife and son on May 13, 2013, was granted asylum, and became a United States citizen in 2021. His son serves in the U.S. Army Reserve and works as a data scientist at a federal agency.

**B. Falun Gong-affiliated organizations knew Mr. Yu's history—and celebrated it.**

40. Defendants and their affiliated organizations did not merely know who Mr. Yu was; for years they held him up as a hero.

41. In 2013, The Epoch Times published a lengthy English-language profile of Mr. Yu recounting his practice of Falun Gong and the persecution he suffered for it: "The Ingenuity and the Danger of Getting a Story to Foreign Media in China," by reporter Amelia Pang (Dec. 30, 2013). A true and correct copy of the profile, retrieved using the Wayback Machine at archive.org, is annexed hereto as Exhibit "A." The profile celebrated Mr. Yu as "the head of the team" that built encrypted communication channels enabling reporters from The Wall Street Journal, The Washington Post, the Associated Press, Time, and the BBC to interview the CCP's victims safely.

It recounted, in unsparing detail, the torture that work cost him: guards who beat his ribs and dug their fingers into his eyes, two months in which he was permitted one hour of sleep a night, days handcuffed to a plank bed, five months without being allowed to wash. And it quoted Dana Cheng describing how she connected Western reporters with Mr. Yu. In 2015 and 2016, NTD broadcast a four-part documentary, *Our Story*, in which Mr. Yu was a principal figure, recounting his underground work and imprisonment.

42. The movement's institutions had long been the direct beneficiaries of Mr. Yu's sacrifice. While Mr. Yu was in China, the information he transmitted at mortal risk flowed to the Falun Dafa Information Center—the press office now directed by Defendant Browde—and to Minghui.org. In 2004, the Information Center supplied the United States Congress with the record of Mr. Yu's persecution, which was entered in the record of the Congressional-Executive Commission on China. In June 2013, shortly after Mr. Yu arrived in the United States, Defendant Browde personally took him to a meal in New York City, joined by Dana Cheng, a senior figure in Falun Gong-affiliated media.

43. Mr. Yu also appeared in Falun Gong-affiliated media as an information-technology expert and commentator, analyzing, among other subjects, the origins and development of the CCP's Internet-censorship apparatus, the so-called Great Firewall. His history was known to senior figures in the movement, whose organizations had themselves received and benefited from information transmitted through the network he built and paid for with a decade of his life.

44. Given this history, Defendants could not have believed that Mr. Yu was an infiltrator or an agent of the regime that imprisoned and tortured him.

**C. Mr. Yu blew the whistle on the treatment of Shen Yun's young performers.**

45. Shen Yun's performers train and live at the Dragon Springs compound in Cuddebackville, New York. Many are minors or young adults, recruited into a training and touring regimen operated by Shen Yun and the affiliated schools on the campus.

46. Beginning in approximately 2017, Mr. Yu received firsthand accounts from former Shen Yun performers describing conduct he understood to be coercive, exploitative, and abusive, particularly toward children and young people. First, the mother of a former Shen Yun performer contacted Mr. Yu and described her daughter having been guarded, searched, humiliated, and subjected to denunciation sessions at Shen Yun's compound.

47. Mr. Yu first raised his concerns internally, contacting Falun Gong authorities, veteran practitioners, and persons associated with the school that trains Shen Yun's performers. No one answered his questions. He was told to keep quiet. The instruction came from Li Yuan, also known as Peter Li, who then served, on information and belief, as the coordinator in charge of Shen Yun's teachers, and who warned Mr. Yu by telephone in May 2017, in a tone Mr. Yu understood as a threat, not to go spreading what he had heard among the practitioners. Having no corroboration beyond the mother's account, Mr. Yu did not spread it: he spoke of what he was learning only privately, and never publicly, and he began paying closer attention to how Shen Yun treated the young people in its care.

48. Over time, additional former performers sought Mr. Yu out. For example, in January 2021, two other former Shen Yun performers spent roughly six hours describing their experiences to him. He became a person they trusted with their accounts of indoctrination beginning in childhood; punishing training and performance schedules imposed on minors; isolation from their families and from the outside world; the withholding of pay, education, and

medical care; religious coercion and psychological manipulation; lasting trauma; and, in a number of accounts, suicide attempts. In every case, the performer communicated with Mr. Yu directly.

49. On August 9, 2023, Mr. Yu reported Shen Yun's suspected forced labor and related conduct to the National Human Trafficking Hotline, which opened Case No. 01435677 identifying him as the reporting person. The Hotline is a federally funded reporting mechanism established for the identification and rescue of trafficking victims. In the same period, he also reported suspected human trafficking and child abuse at Shen Yun through the FBI's online tip portal; he received no response. And he communicated his concerns to a special agent of the U.S. Department of State's Diplomatic Security Service.

50. On August 16, 2023, Mr. Yu published on his YouTube channel his first program publicly presenting accounts that Shen Yun confined and mistreated children. Between August 18 and August 30, 2023, he published nine further programs continuing to present the former performers' accounts. Drawing on those accounts, Mr. Yu publicly accused Falun Gong's affiliated institutions—Shen Yun and the school that trains its performers—of systemic abuse and psychological manipulation of the young people in their care.

51. Mr. Yu published those accounts, and made the reports described above, to vindicate the civil rights of Shen Yun's performers. Those rights include the right to be free from forced labor, involuntary servitude, and trafficking, secured by the Thirteenth Amendment and by the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, 1590, and 1595; the right of the minors among them to be free from abuse, neglect, and unlawful child labor; and their right to speak about their own experiences without retaliation. Mr. Yu was never an employee or contractor of Shen Yun or of any affiliated entity, was never compensated by any of them, had no financial stake in

the outcome, and sought no payment for any of the work described herein. By the time of the events at issue, he had no relationship with Shen Yun at all.

52. He also introduced former performers to reporters at The New York Times for their initial interviews, beginning on October 12, 2023—after the Bulletin described below had already issued. He understood this as a continuation of the same moral commitment for which he had gone to prison: he had once risked everything to protect Falun Gong practitioners from abuse by the Chinese state, and he believed he was now obligated to speak when vulnerable young people were harmed by institutions associated with Falun Gong itself.

53. Mr. Yu's whistleblowing led to significant public reporting and official action. Based on his whistleblowing—including the introductions he made—and the newspaper's own subsequent investigations, The New York Times published eleven articles and a podcast concerning Shen Yun's potential mistreatment of its performers and the inner operations of Falun Gong, beginning in August 2024. Mr. Yu likewise assisted reporting on Shen Yun by CBS Sunday Morning and by the European public broadcaster ARTE. Former performers have since filed federal lawsuits against Shen Yun and its leadership alleging forced labor and related claims.

54. Each of the acts described in this Section—the publication of the performers' firsthand accounts, the August 9, 2023 report to the National Human Trafficking Hotline, the reports to federal law enforcement, and the assistance to journalists investigating the treatment of the performers—was protected activity. Each was a good-faith report of suspected unlawful conduct, or speech on a matter of public concern, undertaken to protect the civil rights of a vulnerable group.

55. Mr. Yu made no secret of his intention to engage the government to ensure that Shen Yun obeyed the law. In a program published shortly after midnight on September 1, 2023,

he announced that he was assembling what he knew and would "report it to the relevant agencies"—"not just the relevant police department, but other agencies as well." In a program published on September 2, 2023, he repeated that, as he had said the day before, he would "report this information to the relevant U.S. departments." Nor did he hide his aim of bringing the performers' accounts to the press so that public attention would move the government to act: he had said as much on August 18, 2023, in the program described below in which he addressed Defendant Zhang by name. And Defendants were watching. Their organs denounced his first exposé by name within a day of its publication, and on information and belief they monitored his channel closely from then on. Defendants thus knew that Mr. Yu was engaged in protected activity, and that it was only a matter of time before his whistleblowing was noticed—by the press and by the government. That is why they set out to destroy him.

**D. Shen Yun and its affiliates turned on him.**

56. Friction had been building for years. Beginning in April 2019, Mr. Yu publicly criticized Falun Gong's media and institutions for being too favorable to the CCP: starting in 2015, they had published flattering coverage of Chinese leader Xi Jinping in hopes of political advantage. Mr. Yu condemned that because he opposed any accommodation of the CCP. In June 2020, at the demand of Falun Gong's founder, Li Hongzhi, Mr. Yu deleted four of his critical programs—those examining the movement's reliance on claims of supernatural powers and experiences.

57. In August 2021—months after Mr. Yu began asking serious questions about Shen Yun—Minghui.org published notices criticizing practitioner-run media. These were understood within the community to be directed at Mr. Yu and his popular YouTube channel. One article insinuated for the first time that there must be some hidden explanation for Mr. Yu's years of underground work and imprisonment. The organization knew exactly who Mr. Yu was; it had simply begun to find his questions inconvenient. But criticism was as far as it went: the 2021

notices did not expel him from Falun Gong, and Mr. Yu remained a practitioner within the community for two more years.

58. But it was Mr. Yu's whistleblowing about the treatment of Shen Yun's children that transformed criticism into destruction. On August 17, 2023—the day after Mr. Yu's first public exposé of Shen Yun's treatment of children, and eight days after his report to the National Human Trafficking Hotline—Minghui.org, Falun Gong's authoritative organ, published an editorial notice denouncing Mr. Yu by name and alias: "Yu Chao (alias Charles Hugo), a Tsinghua University graduate now living in the United States, is such a bad life form" (不好的生命). Published in both Chinese and English editions—the Chinese text consistently harsher than the English—the notice directed that "genuine Dafa disciples must no longer listen to, watch, or give any market to CCP special agents (中共特务) and the bad elements they have been using."

59. The same day, Defendant Zhang—on information and belief a senior leader in the movement—circulated a notice concerning Mr. Yu to local Falun Dafa associations, instructing practitioners to pay no attention to him. The community was ordered, overnight, to treat a man it had celebrated as a hero as a tool of the CCP.

60. The sequence was tight and unmistakable. Mr. Yu made his human-trafficking report on August 9, 2023, and published his first Shen Yun exposé on August 16. The next day, Minghui.org denounced him by name and the community was ordered to shun him. Within fifteen days, however, Defendants' real campaign to retaliate against Mr. Yu began in earnest.

**E. Fearing for his life, Mr. Yu fled to Ohio.**

61. On the night of August 31, 2023, Zeng Yong (also known as Allen Zeng), founder and president of the Falun Gong-affiliated broadcaster Sound of Hope, telephoned a practitioner

to ask where Mr. Yu lived and who else might know. Word of Zeng's inquiries reached Mr. Yu through practitioners alarmed by them.

62. The denunciations escalated to the movement's founder himself. On August 31, 2023, Li Hongzhi published a scripture, "Stay Far Away From Peril," asserting that critics such as Mr. Yu were being used by CCP agents. On or about September 1, 2023, as Mr. Yu fled Massachusetts, Li Hongzhi published a second scripture, "Dafa Spiritual Practice Is Serious," which—without naming him, but in terms the community understood to refer to him—declared that Mr. Yu was possessed by demons, that those who followed or catered to him were committing the gravest of sins, and that practitioners who abandoned the faith would be held to their vows, whose stated consequence is the annihilation of both body and soul. Mr. Yu does not sue on these pronouncements. He pleads them because their timing and content reveal that the campaign was a coordinated, top-down mobilization against a single whistleblower, launched within days of his protected activity, and because they explain both why Mr. Yu fled in fear for his life and why, days later, an accusation as fantastical as "armed and dangerous" would be repeated by the movement's institutions.

63. Mr. Yu took the inquiries about where he lived, coming on the heels of those pronouncements, as a threat to his life. He is a man who spent nearly ten years in Chinese prisons and detention facilities, where he was tortured, for the sake of this same movement, and he had just watched its founder declare that critics like him were possessed by demons and being used by CCP agents. He reacted in real time, publicly and emotionally, on the only platform he had, posting programs that said he feared for his safety and that he would report the matter to U.S. authorities. And he left the state.

64. Mr. Yu never threatened violence against Shen Yun, its campus, or anyone associated with them. He did not say he would harm anyone, he never went to Dragon Springs, and he was never near it. What he did say, repeatedly and publicly, was that Defendants would face consequences for what they had done to their performers: investigation by U.S. authorities, to whom he said he would report them and did; exposure by the press, to whom he said he would bring the performers' accounts and did; and the judgment of their own community. He said these things as a frightened man, and at times in anger. A promise to see wrongdoing investigated and exposed is not a threat of violence, and Defendants, who were watching his channel, knew the difference.

65. On September 1, 2023, Mr. Yu was in Williamstown and then in Pittsfield, Massachusetts, where he boarded an afternoon Amtrak train to Toledo, Ohio. He arrived in Toledo the next morning and remained there until September 4, arriving back in Williamstown that evening. Records, including a campus security log, a bank record, and Amtrak's scan of his ticket, document each step. At no point was he within roughly ninety miles of Dragon Springs. He has never been to Dragon Springs in his life.

66. In one of the programs he posted as he fled, Mr. Yu used the Chinese idiom 敢死队, a "dare-to-die corps," an expression for people prepared to face danger, including death, for a cause. He used it about himself, in a sentence about his own readiness to keep speaking at whatever cost to himself. The sentence named no target and described no act, and it neither stated nor implied any plan to harm anyone. Rendered in English as a wish to join a "suicide squad," and stripped of the sentence in which it appeared, it would become the centerpiece of the accusations against him.

67. On September 3, 2023, from Ohio, Mr. Yu called the Williamstown Police Department, reported that he was a human-trafficking whistleblower in fear for his life, provided

his hotline case number, identified where he was staying, and told the officer that if he turned up dead, investigators should look to the companies he had reported. At Williamstown's request, Toledo police performed a wellness check on him at his hotel that afternoon, documented in Toledo Police Department Incident Report No. TOP23148736.

68. Mr. Yu's conduct in this period was that of an honest man seeking the protection of the law. Indeed, on August 26, 2023—twelve days before the Bulletin issued, and before anyone hunted for his address or went to the FBI—Mr. Yu had walked into the Williamstown Police Department and applied for a Massachusetts License to Carry, because he wished to bring his possession of firearms he had lawfully acquired while living in Minnesota into compliance with Massachusetts law.

**F. Shen Yun went to the FBI, and the FBI issued the September 7, 2023 Bulletin.**

69. Mr. Yu's whistleblowing quickly drew the attention of national news organizations: an investigative reporter for NBC News contacted him on September 6, 2023. A Falun Gong practitioner, distressed by the movement's threats against Mr. Yu, had sent NBC two of his videos on September 1, 2023. Defendants knew what such attention meant. The Epoch Times' own 2013 profile had celebrated Mr. Yu as "the head of the team" that brought the CCP's victims to the foreign press, and his August 2023 exposés were built on performers' firsthand accounts. On information and belief, Defendants anticipated that Mr. Yu would do for Shen Yun's performers precisely what he had once done for Falun Gong's persecuted: bring their accounts to mainstream journalists.

70. They did not have to infer it. In a program published on August 18, 2023, two days after his first exposé, the day after Zhang's notice to the local associations, and nearly three weeks before the Bulletin issued, Mr. Yu addressed Defendant Zhang and the editors of Minghui by name and told them that what they would face was not his "few programs" but "English-speaking people

writing a book," reviewed by "The New York Times or The New Yorker," and "triggering public attention." Defendants thus knew, before anyone went to the FBI, that Mr. Yu was working to bring the performers' accounts to the mainstream press, and that his credibility as a source would be the first casualty of any accusation that he was "armed and dangerous."

71. On or about September 6, 2023, Shen Yun, acting through one or more individuals whose identities are not presently known to Plaintiff, including persons responsible for security at the Dragon Springs campus, communicated to the FBI accusations that Mr. Yu had threatened the Dragon Springs campus, wished to be part of a "suicide squad," and was armed and dangerous. Plaintiff does not sue on that communication. He pleads it because Defendants' later publications cannot be understood without it: the Bulletin those accusations produced became the raw material of a years-long public campaign in which Defendants presented their own accusations as the FBI's independent findings.

72. Mr. Yu's account was poised to reach an audience far beyond his own channel, and on information and belief Defendants knew it: newsgathering of that kind routinely includes requests for comment directed to its subjects. The report to the FBI branded the source an armed threat before any such story could air.

73. Shen Yun's role as the source of the accusations brought to the FBI is confirmed by, among other things, its own affiliated media: The Epoch Times reported, quoting a Shen Yun representative, that "[t]he FBI has been notified and is investigating the threats" against Dragon Springs. Shen Yun's spokesman for the campus, Defendant George Xu, discussed the episode with that newspaper as an insider to the report—describing the mobilization of "local and federal authorities," the state police patrols at "our entrances," and the campus on "high alert."

74. On September 7, 2023, the FBI's New York field office issued the Bulletin. A true and correct copy of the Bulletin is annexed hereto as Exhibit "B." The Bulletin—which by its own terms was based on received information—stated that Mr. Yu "has made threats to the Dragon Springs campus"; that he "was confirmed in the area on 9/1/2023, but has since returned to his home in North West Massachusetts"; that "[i]n one of his most recent videos YU CHAO claimed he wanted to be on a 'suicide squad'" and had videos from 2020 "demonstrating loading his guns"; and that he was "potentially armed and dangerous." The Bulletin was marked "U/FOUO/LES"—Unclassified, For Official Use Only, Law Enforcement Sensitive: an internal law-enforcement document, not a public record, and not the product of any completed FBI investigation. The Massachusetts State Police Fusion Center rebroadcast the Bulletin regionally, and the Williamstown Police Department received it.

75. The Bulletin's account was false in multiple respects. Mr. Yu was not near Dragon Springs on September 1, 2023, or on any other day; as set out above, he was in western Massachusetts and then on a train to Ohio, and by September 7 he was back at his Williamstown home, as the Bulletin itself acknowledged. He had not said that he wanted to join a "suicide squad"; the words so rendered were the idiom described above. On information and belief, that rendering reached the FBI, stripped of the sentence around it, from Shen Yun's representatives, native speakers of Chinese who knew what the sentence meant and chose the most sinister English available for it. And, as the FBI itself concluded after questioning him, he intended no harm to anyone.

76. Defendants knew Mr. Yu's history, because their affiliated organizations had celebrated and filmed it. They knew what his Chinese words meant. And they knew that the FBI had questioned Mr. Yu on September 8, 2023 and taken no action on the supposed threats. They

knew it no later than December 27, 2023, when Mr. Yu recounted the interview in detail in a program published on the channel Defendants were monitoring, months before the earliest publication sued upon. Every publication described below was made with that knowledge.

77. The Bulletin recast the whistleblower, in an official federal document distributed to law enforcement across the region, as a "potentially armed and dangerous" man threatening an attack.

**G. The consequences: an armed visit, a search, a prosecution, and a dismissal.**

78. On September 8, 2023, an FBI supervisory special agent, two other agents, and a Williamstown police sergeant came to Mr. Yu's home. Officers questioned him for approximately three hours. English is not Mr. Yu's first language, and no interpreter was provided.

79. Mr. Yu confirmed that he still possessed the two firearms shown in his 2020 videos, which were taken when he lived in Minnesota. Mr. Yu explained that he purchased the firearms lawfully in Minnesota where he held a concealed-carry permit. He also explained that he had already applied for a Massachusetts License to Carry. He declined a consent search and asked that officers obtain a warrant, which they did that day, seizing a Smith & Wesson handgun, an AR-15 rifle, approximately 645 rounds of ammunition, and 14 magazines.

80. The interaction itself confirmed there was no threat. In the course of the three-hour interview, Mr. Yu addressed and refuted, one by one, the accusations Shen Yun had supplied, and officers determined that Mr. Yu posed no danger to Shen Yun. The sergeant who applied for the search warrant told Mr. Yu, on his body camera, that Mr. Yu should simply have stored the firearms with a dealer while his license application was pending: "[T]hat's where I don't think you did it maliciously. . . . I don't think your intent was to move here to violate the law." The FBI never took any action against Mr. Yu concerning the alleged threats.

81. Nevertheless, on September 14, 2023, a complaint issued in Northern Berkshire District Court charging Mr. Yu with firearms-licensing offenses. He was never arrested, at any point, in connection with any of the events described in this Complaint. That same day, his pending License to Carry application was denied, in a letter expressly citing the Bulletin.

82. The Commonwealth later obtained a six-count indictment in Berkshire Superior Court (No. 2476CR00037) charging Mr. Yu with two counts of possession of a large capacity firearm without a valid license to carry (G.L. c. 269, § 10(m)); two counts of possession of a large-capacity feeding device without a valid license to carry (G.L. c. 269, § 10(m)), and two counts of possession of ammunition without a firearms identification card (G.L. c. 269, § 10(h)(1)). Mr. Yu faced a mandatory minimum penalty of two and one-half years in state prison (and potentially up to ten years in state prison) for the alleged violations of G.L. c. 269, § 10(m).

83. The prosecution consumed nearly three years of Mr. Yu's life. It ended without a conviction after prosecutors dropped the most serious felony charges. On December 22, 2025, Mr. Yu agreed to a continuance without a finding (CWOF) on two counts of the lesser-included offense of possession of a firearm without a firearm identification card (G.L. c. 269, § 10(h)) and two counts of possession of ammunition without a firearms identification card (G.L. c. 269, § 10(h)(1)). Each of those counts is a strict liability misdemeanor. The court imposed a six-month CWOF. Those charges were dismissed on June 18, 2026 after Mr. Yu complied with every condition of the CWOF.

84. Mr. Yu incurred approximately $107,000 in legal fees and related expenses defending the case.

### H. Defendants converted the Bulletin into years of "proof."

85. After Shen Yun brought its accusations to the FBI, Defendants spent the following years citing the resulting Bulletin, and the criminal case that followed it, as though they were independent corroboration of those same accusations.

86. None of the publications described below disclosed that the Bulletin's allegations—the purported campus sighting, the "suicide squad," the armed-and-dangerous claim—originated with Shen Yun. Nor did any publication disclose that the Bulletin was an internal, law-enforcement-sensitive document that by its own terms was unverified and forbade action on its contents alone; that no one had ever "confirmed" his presence anywhere near Shen Yun's campus; that the "suicide squad" line was a context-stripped rendering of an idiom that expressed no intent to harm anyone; that the FBI took no action on the supposed threats; or that the criminal case ended without a conviction and was dismissed. The purported campus sighting is illustrative. The Epoch Times and NTD, which hold themselves out as news organizations, published it as established fact, year after year, without once asking Mr. Yu or his lawyers whether it was true, although it was provably false and the FBI had never acted on it.

87. The Epoch Times built the public narrative. Beginning on March 18, 2024, and continuing through at least August 2026—in articles updated and republished as late as September 2026—Epoch Times reporter Petr Svab published at least sixteen articles concerning Mr. Yu, without once contacting him for comment. Across those articles, and others by other Epoch Times reporters: the claim that the FBI had issued a warning that Mr. Yu was "potentially armed and dangerous" appears in at least twelve; the claim that Mr. Yu was spotted, seen, or confirmed near the Shen Yun campus appears in at least twelve; the claim that he made threatening comments toward Shen Yun personnel appears in at least nine; the claim that he was "arrested" and charged with illegal firearms possession—he was never arrested—appears in at least eight; and the claim

that he was used by the CCP or its regime as a vehicle, tool, or pawn in a smear campaign appears in at least six.

88. On September 9, 2026, one week after this action was filed, The Epoch Times revised eight of those articles to remove the assertion that Mr. Yu had been "arrested," appending to each a correction acknowledging that an earlier version had "incorrectly stated" that fact. By the modification times recorded on the newspaper's own pages, all eight revisions were made in a single window of roughly two and a half hours that evening. The sweep was far from complete: It left the campus-sighting claim standing in every one of the eight, and it left the false arrest claim itself standing in at least one more (*see* "Unraveling the CCP's Playbook for Transnational Repression in America," published June 9, 2025 as Part 1 of the paper's Transnational Repression series, which as of October 16, 2026 still asserts that Mr. Yu "was subsequently arrested and charged with illegal firearms possession" and carries no correction). NTD has corrected nothing: as of October 2026, at least nine NTD articles still assert that Mr. Yu was "subsequently arrested."

89. The campus-sighting claim has a traceable lineage, and at every step Defendants moved it further from the document they procured. The Bulletin says only that Mr. Yu "was confirmed in the area on 9/1/2023"; it reports no sighting, names no observer, and does not say where "the area" was. In March 2024, The Epoch Times, which reported that it had "obtained a copy" of the Bulletin, told readers that the man "was seen in the area," attributing to the document words it does not contain. The Information Center's August 7, 2024 report went further, asserting as its own fact that law enforcement issued its warning "after he was seen near the Shen Yun training center." That sentence invented both a sighting and a sequence, because there was no sighting and the warning did not follow from anyone's observation: it followed from what Shen Yun itself had supplied. Within a day, The Epoch Times adopted the formula, and "spotted near

the Shen Yun campus" became the standard recitation across at least a dozen Epoch Times and NTD articles. A December 19, 2024 Epoch Times article went furthest of all, telling readers that Mr. Yu had been "spotted by local law enforcement near the Shen Yun campus." No law enforcement agency ever reported any such sighting.

90. Defendants had no basis to believe anyone ever saw Mr. Yu anywhere near Dragon Springs. The Epoch Times has admitted as much in print. By July 9, 2025, it revised the December 2024 article to delete the invented police sighting and to substitute the Bulletin's actual phrase, appending this correction: "A previous version of this article incorrectly stated who indicated the presence of a Chinese-American Youtuber in the Shen Yun campus area. It was the FBI." The correction concedes that the sole source for any claim about Mr. Yu's presence was the FBI, whose only words were "confirmed in the area," and that no witness, police or otherwise, ever existed. Yet The Epoch Times left the "spotted near" and "seen near" formulations standing in its other articles, including articles it updated that same week, where they remain published today.

91. Not one of Defendants many publications ever revealed the underlying basis for the Bulletin's "confirmed in the area" allegation: a screenshot—provided to the FBI by Defendants themselves—of a comment on Mr. Yu's YouTube video in which he alerted his followers that Shen Yun was searching for his home address and expressed fear that his life was in danger. Specifically, after posting the video, but before he could leave his home in fear for his safety, Mr. Yu posted a comment in the hope it might throw Shen Yun off the trail of his home. The comment incorrectly claimed to be "near Shen Yun," when he was still home. He deleted the comment within minutes because it could have been misconstrued. He altered the geotag on his post to show him in Plainfield, New Jersey, instead—over 80 miles away from Dragon Springs.

92. In March 2024, The Epoch Times published articles quoting Defendant George Xu concerning Mr. Yu. Xu told the newspaper that "local and federal authorities were mobilized to counter what they believed was a credible threat posed by a Chinese man who posted to social media about wanting to be part of a 'death squad,'" that the man "propagates these same false narratives and had been speaking with some of the same individuals the [New York] Times is interviewing," and that "[a]t one point, this man was known to be in the area of our campus. . . . We had state police patrolling our entrances, and everyone was on high alert. This is very serious." Each of Xu's assertions of threat and presence was false, and the articles—updated and republished as late as July 2025—recited the Bulletin's claims ("suicide squad," "potentially armed and dangerous") alongside the inventory of firearms seized from Mr. Yu's home. As a native Chinese speaker, Xu knew what the phrase meant and the history it carries, but he chose the most sinister rendering anyway.

93. The Traditional Chinese edition of The Epoch Times carried the same interview on March 20, 2024. In that account, Xu described local and federal authorities mobilizing "several months earlier" against a Chinese man who had posted that he wished to become a member of a "dare-to-die corps" (敢死隊) and "had also posted a video of himself loading an AR-15 rifle." Those two posts were nearly three *years* apart, not mere "months" as Xu falsely claimed. Mr. Yu posted the rifle video on November 3, 2020, while living in Minnesota when he was concerned about election-related political violence; he used the idiom in September 2023, as he fled his home in fear of Shen Yun and its proxies. Even the Bulletin kept the two apart, dating the gun videos to 2020. Xu compressed them into a single time frame, and in doing so said plainly what Defendants' campaign elsewhere left to implication: the menace attributed to Mr. Yu was fabricated by knowingly fusing unrelated events separated by years.

94. The Simplified Chinese edition of The Epoch Times published its version of the same story on March 27, 2024, and went further still. Its subheading, printed in the newspaper's own voice and attributed to no one, announced: "Chinese-American man threatens to attack Shen Yun; police seize two guns." The Bulletin says that Mr. Yu "has made threats to the Dragon Springs campus," and the article itself recites that language two sentences later. The subheading converted "threats" into "threatens to attack," and converted a place into Shen Yun itself, a company and the people in it. The article then told its readers that the FBI wrote in its alert that this man claimed he "wanted to join a '自杀小队.'" That quotation is fabricated. 自杀小队 means a "self-killing squad," and in Chinese it carries the connotation of a suicide-bombing unit. The FBI never wrote those words in any language, and Mr. Yu never said them. The phrase is a back-translation of the Bulletin's English "suicide squad," rendered one step more sinister and attributed to a federal agency as a verbatim quotation. The newspaper could not be ignorant of the actual words when its own Traditional Chinese edition had printed them one week earlier.

95. On December 18, 2024, at a community seminar near Dragon Springs, Defendant Browde personally displayed the Bulletin to the audience, telling them that the FBI issues such alerts "when they know someone to be an imminent threat, possibly armed and dangerous," and asserting of Mr. Yu: "he was found to be in the area—he's making direct threats—stuff like Suicide Squad, things of that, to Dragon Springs," and that "[t]he FBI traced him back to his home. He was eventually arrested for illegal weapons possession charges." Every element of that account—the presence, the threats, the "Suicide Squad," the arrest—was false, originated with Shen Yun rather than the FBI, and was presented to the audience as the FBI's own conclusions. At the same seminar, Browde presented Mr. Yu as a stranger—"the Chinese YouTuber that brought interview candidates and pitched the whole story to the New York Times"—although Browde had known

who Mr. Yu was for two decades: the Information Center Browde directs had received the information Mr. Yu transmitted from China, had documented his persecution to Congress in 2004, and Browde had personally taken Mr. Yu to a meal upon his arrival in the United States in 2013.

96. The violence narrative escalated. In June 2025, Minghui.org—the Falun Gong movement's authoritative organ, whose August 2023 notice had first denounced Mr. Yu by name—published, in Chinese and English, an article asserting that the source who had "pitched" The New York Times its Shen Yun story "is a potential school shooter identified by the FBI," who "has made threats against two Falun Gong-affiliated religious schools," is "a self-described 'sociopath,'" and "was arrested and is now facing two counts of illegal weapons possession"—and warning that publicity "will encourage the potential shooter's violent tendencies or even instigate an attempt on a Falun Gong-affiliated school." The FBI never identified Mr. Yu as a "potential school shooter" or as anything else; it repeated what Shen Yun had told it. Mr. Yu threatened no school and no person, and he was never arrested. Two years after Shen Yun went to the FBI, the movement's authoritative organ had inflated those accusations into a supposed FBI finding that a whistleblower was a school shooter in waiting.

**I. Defendants branded a torture survivor an agent of his torturers.**

97. Finding the "armed and dangerous" narrative insufficient—particularly for Chinese speakers who, if they watched his videos themselves, knew that Mr. Yu made no threat—Defendants pressed a second, equally false accusation: that Mr. Yu is an agent, proxy, or instrument of the Chinese Communist Party, the regime that imprisoned and tortured him for nearly a decade for defending Falun Gong practitioners.

98. On August 7, 2024, Defendant Information Center—whose Executive Director is Defendant Browde—published a report titled "Weaponizing Social Media," describing an unnamed U.S.-based YouTuber matching Mr. Yu in every particular and asserting that he "may

be acting as a foreign agent of the CCP but is not registered as such." The same report asserted that, beginning in late August 2023, Mr. Yu made "deranged comments" and began "issuing death threats to the Falun Gong community and Shen Yun training center," and that United States law enforcement issued its warning "after he was seen near the Shen Yun training center." Mr. Yu issued no death threat to anyone, and no one saw him near the training center. Browde wrote or approved that report and the Information Center's subsequent publications concerning Mr. Yu.

99. Shen Yun itself adopted and promoted the Information Center's accusations in its own official public statements. In an official statement published on its website on August 17, 2024, addressing what it called recent media misrepresentations, Shen Yun expressly invoked and relied upon the Information Center's August 7, 2024 report, to which the statement as originally published hyperlinked,—including its claims that the CCP was attacking Shen Yun through social-media influencers and activated "spies," and that the allegations in recent media reports came from individuals with "known ties" to that CCP campaign. By adopting, ratifying, and republishing the Information Center's report, Shen Yun made the report's accusations its own.

100. The Epoch Times joined in the attack accusing Mr. Yu of being an agent of the CCP, laundering its accusations through anonymous voices. On November 21, 2024, it published an article quoting a purported insider in China's public-security system, identified only by the pseudonym "Hua Sheng," who asserted that a U.S.-based YouTube commentator had been "completely used" by China's state-security apparatus and "has already become a pawn of the CCP," publishing whatever materials its operatives supply. The Epoch Times identified no factual basis for the accusation: not one item of Mr. Yu's content allegedly supplied by the CCP, not the source's identity, position, or basis of knowledge, and not any step taken to verify the claim. It did not contact Mr. Yu for comment.

101. Across the rest of the campaign, Defendants and their affiliated outlets abandoned even that hedge, asserting outright that Mr. Yu was "CCP-backed," "CCP-employed," a CCP "proxy," and an unregistered "foreign agent of the CCP." But even in its initial hedged form—a "pawn" who may not know his handlers—the accusation rested on a concrete false assertion of fact: that the content Mr. Yu publishes is supplied to him by CCP intelligence operatives. It is not; no such operative, and no such supplied content, exists.

102. While it published these accusations, The Epoch Times deleted from its website the favorable coverage it had previously given Mr. Yu, including its lengthy 2013 profile of his sacrifice for Falun Gong—erasing its own record of the history that refuted the narrative it was now constructing. The deleted article survives in an Internet Archive capture. What The Epoch Times erased was its own account of Mr. Yu doing, at the risk of his life, what Defendants would later brand espionage when the victims were Shen Yun's performers rather than the CCP's: connecting persecuted people with the free press.

103. Defendants built the CCP-agent accusation on a purported secret document: they repeatedly claimed that "leaked" internal documents or meeting notes of China's Ministry of Public Security, from approximately June 2024, named Mr. Yu as an individual the Chinese regime would give "full support" in attacking Shen Yun. In December 2024, the Information Center published that "[a] YouTuber who has made violent threats against Shen Yun performers and faces illegal weapons charges in the United States . . . was listed by name in leaked notes from Ministry of Public Security meetings as someone that the regime's apparatus should support." The same publication told readers what that meant, presenting Mr. Yu under the bolded heading "Beijing backed social media influencer" and asserting that "Beijing-backed YouTubers named in CCP documents have spread false claims or violent threats directed at Falun Gong and Shen Yun." That

publication remains live on the Information Center's website today, still telling readers that Mr. Yu "faces illegal weapons charges," though the charges were dismissed on June 18, 2026. As recently as December 19, 2025, the Falun Gong-affiliated outlet Vision Times repeated that a "CCP-backed Chinese YouTuber based in the United States—named in leaked June 2024 internal documents from China's Ministry of Public Security"—was a "CCP-employed proxy . . . currently facing charges in the United States for illegal weapons possession" who "has issued violent threats against Shen Yun's New York campus."

104. The purported documents have never been produced, published, or independently authenticated. By the Information Center's own account, they came from anonymous sources said to be inside China's security apparatus—sources whose identities, positions, and reliability no reader can test, and of the same kind that The Epoch Times invoked in November 2024. And the accusation those documents were used to support—that Mr. Yu publishes material the CCP feeds him—is not an unfalsifiable abstraction; it is a concrete claim of fact. Not one of these publications identified a single item of Mr. Yu's content allegedly supplied by the CCP, a single supplier, a single channel of transmission, or a single step taken to verify the charge before publishing it.

105. The Information Center's own editing history shows how little confidence it had in its proof. On August 8, 2024, the day after publication, the Information Center quietly revised the report in six places. Five of the six changed claims of a leaked "document" into claims of leaked "notes" describing a document, and the sixth altered the wording of a passage the report presents as a verbatim quotation of a Ministry of Public Security meeting. The report also announced that a fuller version, with evidentiary materials, had been intentionally withheld from the public version and was available upon request and for private briefings. The accusations, in other words, were built for distribution to selected audiences while the claimed proof stayed beyond examination.

106. The claims are false: the material Mr. Yu has published about Shen Yun came from his own firsthand interviews with former performers and his own investigation, and from no one else. Defendants either fabricated the claim, knew it to be false, or asserted it without regard to its truth. They knew what the Chinese regime had actually done to Mr. Yu: hunted him, imprisoned him for nine and a half years, and tortured him, because he served the community Defendants speak for.

107. These and similar publications—republished by affiliated outlets in multiple languages and countries, recited in "investigative reports," posted in December 2024 to the official website of a member of Congress, and republished in July 2025 by a member of the U.K. House of Lords—seldom named Mr. Yu explicitly. They did not need to. The identifying details (a Chinese-American YouTuber; prior imprisonment in China for his Falun Gong affiliation; ties to the New York Times' sources; Massachusetts weapons charges; the Bulletin; Dragon Springs) unmistakably identified him to everyone who mattered: his community, his colleagues, journalists, public officials, and anyone with a search engine. How readers actually understood these accusations is not a matter of speculation, because they said so in comment sections The Epoch Times maintains and moderates. The Epoch Times' December 13, 2024 article presented exactly two individuals as examples of CCP agents operating in the United States: one a man who pleaded guilty to acting as an illegal agent of the Chinese government, and the other identified solely by Mr. Yu's constellation of details—the FBI alert, the firearms charge, the purported tracking "near the Shen Yun campus," and the role in The New York Times' reporting. Within roughly forty-eight hours, readers responded beneath the article that "[t]hese CCP agents need to be rooted out and EXECUTED"; that a task force should "hunt down CCP rat agents in the USA and execute them on the spot"; and that "CCP agents found practicing their warfare on US soil should be shot

on sight." Beneath an earlier article carrying the same description of Mr. Yu, a reader proposed that "[p]ublic executions would go a long way." And on The Epoch Times' Chinese-language platform, readers completed the identification the articles invited—writing, by name, that "the Y blogger is Yu Chao, a CCP spy" who should be reported to the authorities and sent "back to China"—in comments posted as recently as August 2026 and still published today. That is what "CCP agent" meant to the audiences Defendants addressed: an accusation of conduct meriting prison or death, which The Epoch Times' own readers, on its own platforms, attached to Mr. Yu by name.

108. The multiplication continues. On July 11, 2026—three weeks after the criminal case was dismissed—an American law-enforcement trade publication, Law Enforcement Today, published an article by its owner, Kyle S. Reyes, titled "Foreign Agents, American Targets: Inside the Campaign Against Shen Yun," recycling the Information Center's narrative concerning Mr. Yu, including the September 2023 "Officer Safety" alert (which the article attributed to the Justice Department). The article also told its law-enforcement readership that the alert had gone to police "in New York and Massachusetts," a distribution detail appearing in none of Defendants' public accounts, and repeated as fact that the warning issued "after he was seen near Shen Yun's headquarters." On information and belief, those details reached the publication from Defendants or their agents, consistent with the Information Center's standing offer of its withheld materials for private briefings. Two days later, on July 13, 2026, The Epoch Times published a Chinese translation of that article—followed by traditional-character and Hong Kong editions on July 14 and a repost by another Chinese-language outlet the same day—presenting to Chinese-language readers, as the independent reporting of an American law-enforcement outlet, the very accusations Defendants had originated. Each republication by a third party, and each recirculation of it by

Defendants, reaches new audiences and multiplies the injury. That is the consequence Defendants intended.

**J. *Unbroken*: Defendants consolidated the campaign into a film and screened it from festivals to Capitol Hill.**

109. On March 24, 2026, NTD broadcast *Unbroken*, an approximately eighty-two-minute documentary film produced, written, edited, and marketed by NTD personnel, with the participation of The Epoch Times, whose reporter Petr Svab appears as an on-camera authority, whose editor-in-chief and chief financial officer are credited in the film's "Special Thanks," and whose marketing director directed the film's marketing and promotion. The film's trailer marketed it as a "True Crime Documentary."

110. *Unbroken* presents itself as an independent journalistic investigation into a CCP campaign of "transnational repression" against Shen Yun and Falun Gong. Its central visual device is a network chart of the purported CCP repression apparatus, with China's leader at the top—and an "Anti-Falun Gong Chinese YouTuber," identifiable in every particular as Mr. Yu, placed within the network beneath the CCP's security organs, alongside the former Shen Yun performers who came forward and the New York Times reporting they informed.

111. In the film, statements about Mr. Yu include: that he had been "spying around" near the Shen Yun campus; that he "talked about having a suicide squad"; that he made violent statements directed at the Falun Gong community; that he was seen operating around Shen Yun's headquarters; that he supplied Shen Yun-related information to The New York Times; and that he is part of the CCP network attacking Shen Yun.

112. Among the speakers was Shen Yun's own public voice. Leeshai Lemish has been Shen Yun's master of ceremonies since the company's founding in 2006, has emceed nearly two thousand Shen Yun performances, and hosts a Shen Yun-branded podcast. Speaking in *Unbroken*

in his capacity as Shen Yun's host, about Shen Yun's own campus and community, Lemish asserted of Mr. Yu: "This individual has talked about having a suicide squad and about violence against our community and was seen walking around our headquarters. He was spying around campus." Each of those statements was false, and each was made by an agent of Shen Yun, speaking on a subject within the scope of his role as the company's public representative, in a film produced by Shen Yun's affiliated broadcaster.

113. *Unbroken* also deceived its audience about its own reliability. It presented its featured investigator as an independent journalist without disclosing that he—like the film's director, producer, writers, editors, camera operators, and principal interviewees—is a Falun Gong practitioner working within Falun Gong-affiliated media, reporting on his own religious movement's adversary, the CCP.

114. No one involved in *Unbroken* contacted Mr. Yu before broadcast, and the film says nothing about who Mr. Yu is: nothing about his nearly three decades of practice or his nine and a half years in Chinese prisons for defending Falun Gong practitioners, nothing about the FBI's determination that he posed no threat, and nothing about the collapse of the criminal case the film invokes. On July 27, 2026, Mr. Yu publicly responded to the film's claims in a comment on *Unbroken*'s own social-media account; NTD did not respond, correct, or retract.

115. *Unbroken* was not merely broadcast. It was screened at organized events around the world and entered in film festivals. On June 18, 2026, Defendants staged a red-carpet premiere in Los Angeles, and that same month NTD released the film for commercial sale—in fourteen language versions—on Apple TV, Amazon, Google Play, NTD's own subscription platform, and the affiliated Ganjing World platform, where it remains on sale today. Red-carpet premieres have continued since, including an August 24, 2026 premiere in San Francisco promoted by Sound of

Hope, the broadcaster Zeng founded. By Defendants' own account, the film had been viewed more than one million times by June 2026: NTD's own outlet reported that total views had "surpassed one million," and The Epoch Times repeated that figure in celebrating the streaming release. The June 2026 commercial release was a distinct act of republication. And on July 22, 2026, Defendants' affiliates staged a screening and panel discussion of the film on Capitol Hill in Washington, D.C., attended by members of Congress. The campaign has continued since this action was filed: on September 15, 2026, a Chicago premiere was announced by press release; a Lexington, Massachusetts premiere was held on September 19, 2026; and another premiere was held on September 21, 2026; and The Epoch Times covered it twice.

116. Defendants published and republished all of the foregoing with knowledge of falsity or reckless disregard for the truth—and their knowledge only grew. By no later than April 2025, Mr. Yu's sworn affidavit and supporting records demonstrating his whereabouts on September 1, 2023, the meaning of the words rendered as "suicide squad," and the falsity of the Bulletin's claims were filed in the public record of the criminal case. Mr. Yu repeatedly and publicly rebutted the accusations on his own platforms and in interviews. On July 2, 2026—after more than two years of coverage—Epoch Times reporter Petr Svab contacted Mr. Yu for the first time; when Mr. Yu responded that The Epoch Times should first address its years of false reporting about him, no substantive response, correction, or retraction followed. To this day, no Defendant has retracted or corrected anything.

**K. The campaign was coordinated, and it was enforced.**

117. Over and over again, the same false claims—the same "suicide squad" phrase, the same campus-sighting claim, the same Bulletin, the same CCP-agent narrative—appeared across Shen Yun's statements, its campus spokesman's statements, The Epoch Times, NTD, the Information Center, and a constellation of affiliated outlets, over a period of years, without material

variation and without any outlet ever acknowledging Mr. Yu's denials, his documented alibi, or the collapse of the criminal case.

118. That uniformity reflects common direction. The Falun Gong movement's media and institutional leadership operate under centralized coordination: on information and belief, the leadership of the movement's media organs regularly receives direction on coverage priorities and reporting principles from the movement's most senior leadership, major projects require senior approval, and personnel move fluidly among Shen Yun, Dragon Springs, the affiliated schools, the Information Center, The Epoch Times, and NTD. A former president of the Epoch Times Group told Mr. Yu in 2019 that even individual articles on sensitive subjects were reviewed and approved at the movement's highest level. This coordination is documented in the movement's own writings: in a Signal group of the movement's affiliated "self-media" hosts (maintained under the auspices of the media company Pure Springs Media Inc. and, later, Kaixin Media Alliance, Inc.), Zeng personally relayed "important notice[s]" conveying content directives to the movement's broadcasters and commentators—directives he attributed to named intermediaries relaying instructions from above and, in his own words, to what "SF" (on information and belief, 师父, "Master"—the movement's founder) had "told us to do"—and directed the hosts to "act upon it ASAP"; the hosts, including hosts affiliated with Defendants' media organs, confirmed compliance in writing.

119. The campaign was also enforced with coercion. Practitioners who declined to join it were punished: Simone Gao, a former television anchor who had interviewed Mr. Yu, was ordered to delete her interviews of Mr. Yu—programs dating back to 2015—from the internet—an order relayed to her on September 2 and 3, 2023, on information and belief, by Defendant Zhang, who said it came from Li Hongzhi himself—and she complied. When Zeng later learned

that she had warned Mr. Yu of Zeng's hunt for his address, Zeng demanded that she sever all contact with Mr. Yu. This time, she did not comply. As punishment, Zeng cut her off from advertising and project cooperation with the affiliated media businesses he controls, and she was publicly expelled from the community. The message to every member of the community, and to every potential witness to the treatment of Shen Yun's performers, was unmistakable: support Mr. Yu, or echo what he reported, and you will be next.

120. On information and belief, each Defendant knew of and intended the acts of the others in furtherance of the common design described in this Complaint: to destroy Mr. Yu's credibility and livelihood in retaliation for his whistleblowing, and to deter others from coming forward. Each Defendant's publications expressly built upon, cited, and amplified the others': The Epoch Times reported Shen Yun's account of the FBI report; Shen Yun adopted the Information Center's report; the Information Center invoked the Bulletin and the criminal case; and NTD's *Unbroken* consolidated all of it—with The Epoch Times' reporter and Shen Yun's master of ceremonies on camera—into a single product for global distribution.

**L. Mr. Yu's damages.**

121. Defendants' statements—accusing a whistleblower of violent threats against a religious community's campus and schoolchildren, of being "armed and dangerous," and of covert service to a hostile foreign power—are defamatory per se: they impute serious crimes and are calculated to destroy a person's standing in his profession and community.

122. The false accusations succeeded. Mr. Yu's reputation in the Chinese-American community—the community in which he lived, worked, and built his audience as a commentator—has been gravely damaged; to a substantial audience he is now the armed man from the FBI warning. He lives with the omnipresent fear that official records falsely describe him as a violent threat, a fear Defendants renew with every republication.

123. The "CCP agent" accusation inflicts a distinct and particularly cruel injury. Mr. Yu's adult life is defined by his opposition to the Chinese Communist Party and by what that opposition cost him: his career, his liberty, his health, and most of his son's childhood. He has spoken up for Falun Gong practitioners on two continents, against the Chinese state and against the organization he had supported his entire adult life. To be branded an agent of his own torturers, by the community he went to prison defending, is a torment of a different order. Defendants understood that. They knew his history.

124. The sustained strain of the prosecution and the public campaign has inflicted severe emotional distress with physical manifestations, for which Mr. Yu has sought professional treatment. In approximately September 2025, Mr. Yu became unable to continue working and went on medical leave, suffering a substantial loss of income and impairment of his earning capacity in his chosen career.

125. Because the publications remain online, continue to be republished—including through the ongoing global distribution of *Unbroken*—and continue to be amplified, the injury is ongoing. Plaintiff's recoverable damages include, among other measures and without limitation, the reasonable costs—both those already incurred and those reasonably to be incurred—of corrective publication to counteract Defendants' false statements among the audiences that received them.

## COUNT I

### Defamation—The Threat Narrative
### (against Shen Yun, The Epoch Times, NTD, Xu, Browde, the Information Center, and Dragon Springs)

126. Plaintiff restates and realleges the foregoing paragraphs as if fully set forth herein.

127. From at least March 2024 through the present, including in publications within one year of the filing of this Complaint, Defendants Shen Yun, The Epoch Times, NTD, Xu, Browde, and the Information Center, directly and through their officers, representatives, agents, and affiliated press organs acting in concert with them, published and republished to the general public false statements of fact concerning Plaintiff: that he had threatened Shen Yun, its campus, its performers, and its community; that he had been confirmed, seen, or tracked near the Dragon Springs campus; that he had announced a wish to join a "suicide squad," "death squad," or "自杀小队" ("self-killing squad"); that he was "armed and dangerous"; that he was a "potential school shooter" who had "made threats against two Falun Gong-affiliated religious schools"; and that he had been "arrested." Those statements include The Epoch Times' articles beginning March 18, 2024; The Epoch Times' March 27, 2024 Simplified Chinese article, including its subheading and its fabricated quotation attributed to the FBI; Defendant Xu's March 2024 statements to The Epoch Times, made in his capacity as President of Dragon Springs and as a spokesman for Shen Yun; Defendant Browde's December 18, 2024 presentation of the Bulletin; the Information Center's December 2024 publication asserting that Mr. Yu "has made violent threats against Shen Yun performers"; the Information Center's August 7, 2024 report asserting that Mr. Yu was "issuing death threats to the Falun Gong community and Shen Yun training center" and had been "seen near the Shen Yun training center"; the statements of Shen Yun's master of ceremonies and others in NTD's *Unbroken*; and the affiliated republications described above.

128. These statements did not merely quote a law-enforcement document. Defendants presented the Bulletin's recitals as the FBI's independent findings while concealing that the accusations had originated with Shen Yun; that the Bulletin was an internal, unverified document that forbade action on its contents alone; that the FBI had questioned Mr. Yu within a day of the

Bulletin's issuance and had taken no action on the supposed threats; that the "suicide squad" phrase was a context-stripped rendering of an idiom that expressed no intent to harm anyone; and that the criminal case concerned firearms licensing and ended without a conviction. Defendants also added falsehoods of their own, including that Mr. Yu had been "arrested," was a "potential school shooter," and had been "spying around" and "seen walking around" the campus.

129. The statements were of and concerning Plaintiff. Where they did not name him, they described him by a constellation of uniquely identifying details, including his prior imprisonment in China, his YouTube channel, his Massachusetts residence and firearms charges, and his connection to The New York Times' reporting, such that readers understood them to refer to him.

130. The statements were false. Plaintiff made no threat against Shen Yun, its campus, or anyone else; he was never in the area of the campus on September 1, 2023 or at any other time; the words rendered as "suicide squad" expressed no wish to harm anyone; he was dangerous to no one; and he was never arrested. "Armed and dangerous" is a law-enforcement phrase whose sting lies in the danger, not the possession: it describes a person believed ready to commit armed violence. That Mr. Yu owned firearms, as tens of millions of Americans do, made him no more "dangerous" than any of them—he had threatened no one, and the FBI, having questioned him the day after the Bulletin issued, took no action against him. The statements were defamatory per se: they impute crimes of violence, including threats against a campus housing children, and they prejudiced Plaintiff in his profession as a journalist and commentator.

131. Defendants made the statements with knowledge of their falsity or with reckless disregard for their truth. Defendants knew Plaintiff's history, because their own organizations had documented and celebrated it. They knew what his Chinese words meant. They knew, no later than

December 2023, when Mr. Yu publicly recounted the September 8 interview on his channel, that the FBI had questioned him and taken no action, that he had never been arrested, and that the criminal case concerned firearms licensing. None of them contacted Plaintiff for comment before publishing. As to the claim that Plaintiff had been confirmed, seen, or tracked near the campus, The Epoch Times and NTD published and republished it with knowledge of its falsity or reckless disregard for its truth: it was provably false, and the records proving it so were filed publicly in April 2025; the FBI never acted on it; and neither organization, though each holds itself out as a news organization, ever asked Plaintiff or his counsel for comment on it. By July 9, 2025 at the latest, The Epoch Times had re-examined the Bulletin: its printed correction of that date concedes that the FBI alone "indicated the presence" of Mr. Yu in the campus area, and the Bulletin reports no sighting at all. Every "spotted near" and "seen near" assertion left standing after that date was therefore maintained with knowledge of what the Bulletin actually says. And on September 9, 2026, one week after this action was filed, The Epoch Times re-read these articles closely enough to remove the word "arrested" from eight of them, and left the sighting claim in place in every one. More than a month after its printed corrections conceded the arrest claim was false, it continues to publish that claim, uncorrected, in a ninth article. The Epoch Times tipped its hand about its intent not to report facts, but to destroy Plaintiff's reputation specifically, by deleting its own prior favorable coverage of Plaintiff. And Defendants continued to publish after Plaintiff's sworn affidavit and supporting records were filed in the public record of the criminal case in April 2025, after the criminal case was dismissed in June 2026, and after Plaintiff responded directly to The Epoch Times in July 2026.

132. No privilege attaches to these publications. Plaintiff does not sue on any communication Defendants made to the FBI; he sues on Defendants' separate and subsequent

publications to their community, their followers, public officials, and the world, which served no law-enforcement purpose, were directed to no governmental body, and mirrored no petition. Nor were the publications fair reports of an official proceeding: the Bulletin was an internal, law-enforcement-sensitive document, not a public record or proceeding; Defendants' accounts of it were neither fair nor accurate, omitting its unverified basis, its express instruction that no action be taken on it alone, and the FBI's subsequent inaction; and Defendants presented a recitation of their own accusations in the Bulletin as the FBI's independent conclusions. In doing so, Defendants clothed their own falsehoods in the apparent credibility of the nation's premier law-enforcement agency.

133. Shen Yun is liable for the statements of its officers, agents, and representatives, including Defendant Xu, who spoke to the press as Shen Yun's spokesman for the campus on which it trains and houses its performers, and Shen Yun's master of ceremonies, who spoke in *Unbroken* in his capacity as Shen Yun's public representative. The Epoch Times is liable for the articles of its reporters and editors. NTD is liable for *Unbroken*, which its personnel produced, wrote, edited, broadcast, and marketed. Defendant Browde is liable for his own statements and for the Information Center reports he authored or approved. The Information Center is liable as the publisher of its own reports and statements. Dragon Springs is liable for the statements of its President, Defendant Xu, and of its planning-office Vice President, Defendant Browde, each speaking about the campus Dragon Springs owns, and about the purported threat to it, within the scope of his office. Each of these Defendants is further liable, as alleged in Count V, for the publications of the others made in furtherance of their common design.

134. Defendants made the statements because of, and in retaliation for, Plaintiff's protected activity: his publication of the firsthand accounts of Shen Yun's performers and his

reporting of suspected human trafficking and forced labor to a federally funded hotline and to federal law enforcement, undertaken to protect and vindicate the civil rights of those performers. As a direct and proximate result, Plaintiff suffered damages, including continuing reputational destruction, loss of professional opportunities and income, and severe emotional distress with physical manifestations, in an amount to be proven at trial.

**COUNT II**

**Defamation—The CCP-Agent Accusation**
**(against Shen Yun, The Epoch Times, NTD, Browde, and the Information Center)**

135. Plaintiff restates and realleges the foregoing paragraphs as if fully set forth herein.

136. From at least August 2024 through the present, including in publications within one year of the filing of this Complaint, Defendants Shen Yun, The Epoch Times, NTD, Browde, and the Information Center, directly and through their officers, representatives, agents, and affiliated press organs acting in concert with them, published and republished to the general public false statements of fact that Plaintiff is an agent, proxy, tool, or "pawn" of the Chinese Communist Party; that he is "Beijing-backed" and, through affiliated outlets acting in concert with Defendants, "CCP-backed" and a "CCP-employed proxy"; that he is an unregistered "foreign agent of the CCP"; that the content he publishes is supplied to him by CCP intelligence operatives; and that "leaked" internal Chinese Ministry of Public Security documents named him as an operative to whom the regime would give "full support." Examples of these publications specific to the respective Defendants are detailed in the following paragraphs.

137. By The Epoch Times: articles by reporter Petr Svab and other Epoch Times personnel between March 2024 and July 2025, published without ever contacting Plaintiff, describing Plaintiff as a CCP vehicle, tool, or pawn, including the November 21, 2024 article

asserting, through a pseudonymous source, the false factual claim that CCP intelligence operatives supply the content Plaintiff publishes.

138. By Defendants Browde and the Information Center: the August 7, 2024 "Weaponizing Social Media" report describing Plaintiff as possibly "acting as a foreign agent of the CCP"; the December 2024 publication presenting Plaintiff under the heading "Beijing backed social media influencer" and asserting that he "was listed by name in leaked notes from Ministry of Public Security meetings."

139. By Shen Yun: its official public statements, including its August 17, 2024 website statement, adopting, ratifying, invoking, and republishing the Information Center's accusations that the recent allegations against Shen Yun originated with individuals tied to a CCP campaign, accusations describing Plaintiff.

140. By NTD: the documentary *Unbroken*, broadcast March 24, 2026 and distributed continuously since, with the participation of The Epoch Times, which places Plaintiff within a purported CCP repression network, beneath the CCP's security organs, as an instrument of the regime, and which has been marketed as "True Crime" and screened worldwide, including on Capitol Hill on July 22, 2026.

141. The purported leaked Ministry of Public Security materials have never been produced or authenticated and rest on anonymous, untestable sources, if they exist at all; and the accusations built upon them—that Plaintiff is a "CCP agent" and that the CCP supplies the material Plaintiff publishes—are concrete factual claims that are false. Defendants presented their "CCP agent" accusations as assertions of fact resting on that purported documentary proof and on claimed inside knowledge—not as characterizations or opinions that they formed based on disclosed, true underlying facts. Accusing Plaintiff of being an agent of the very regime that

imprisoned and tortured him—on the strength of unverified and unproduced documents—was, at best, reckless indifference to the truth, and Defendants' intimate knowledge of Plaintiff's history made the accusation knowingly false.

142. Although many of these publications did not name Plaintiff explicitly, they described him by a constellation of uniquely identifying details such that readers understood the statements to be of and concerning Plaintiff. Many people share the name "Yu Chao"; only one person matches the FBI alert, the Massachusetts firearms charges, the purported sighting near Dragon Springs, and the role in The New York Times' reporting that Defendants recited together. Their readers closed the gap, supplying Plaintiff's name in comments on The Epoch Times' own platform. Accusing by description rather than by name did not lessen the certainty with which readers understood the statements to be of and concerning Plaintiff.

143. The statements were false and defamatory per se: they impute disloyalty to the United States and covert service to a hostile foreign power, and they were calculated to—and did—destroy Plaintiff's reputation and his profession as a commentator and whistleblower.

144. Defendants made these statements with knowledge of their falsity or reckless disregard for the truth. Defendants knew Plaintiff's history because their own organizations had documented, published, and celebrated it. By April 2025, Plaintiff's sworn affidavit and supporting records had been filed in the public record of the criminal case, refuting the threat accusations on which the CCP-agent narrative was built. Defendants and their affiliated outlets continued to publish and republish the accusation, including in the 2026 film *Unbroken*, in Vision Times' December 19, 2025 "CCP-employed proxy" publication, and in The Epoch Times' July 13, 2026 republication of a third-party article recycling the same accusations. No Defendant has retracted

any of it, even after Plaintiff responded directly to Defendants' inquiries and public postings in July 2026, and even after the criminal case was dismissed on June 18, 2026.

145. Each Defendant knew the publications were false, as alleged above. The Epoch Times had published a 2013 profile documenting Mr. Yu's history, then deleted it while its reporter published at least sixteen articles about him without seeking comment. When The Epoch Times finally contacted Plaintiff on July 2, 2026, he denied the accusations and demanded a correction, but it neither corrected its reporting nor stopped publishing. NTD likewise had produced and broadcast Our Story, which celebrated Mr. Yu's underground work and imprisonment for Falun Gong, yet *Unbroken* omitted that history and recast him as a CCP operative. Defendant Browde had known of Mr. Yu for two decades and personally since June 2013; in March 2014, he received by email The Epoch Times profile and Mr. Yu's résumé. The Information Center itself had received Mr. Yu's reporting from China and submitted his persecution record to Congress in 2004. Yet Browde portrayed Mr. Yu as a stranger and an instrument of the CCP. Shen Yun knew Mr. Yu as well: its coordinator in charge of Shen Yun's teachers had warned him by telephone in May 2017, and its campus spokesman, Defendant Xu, spoke to the press about him in March 2024. Shen Yun nonetheless adopted the Information Center's accusations as its own. Each of these Defendants published accusations contradicted by its own records, personnel, and institutional history.

146. Shen Yun is liable for the accusations it adopted, ratified, and republished in its own official statements. Defendant Browde is liable for his own statements and for the Information Center reports he authored or approved; the Information Center is liable as the publisher of its own reports. The Epoch Times and NTD are liable as the authors, publishers, and distributors of their

respective publications. Each of these Defendants is jointly liable for the publications of the others made in furtherance of their common design, as alleged in Count V.

147. No privilege attaches to any of these publications. The accusation that Plaintiff is an agent of the Chinese Communist Party was made to no governmental body, sought no governmental action, mirrored no petition, and reported no official proceeding. It was published to Defendants' community, their followers, and the general public as a free-standing publicity campaign. To the extent Defendants coupled that accusation with recitals of the Bulletin, no fair-report privilege attaches for the reasons alleged in Count I: the Bulletin was an internal, law-enforcement-sensitive document rather than a public record or proceeding, and Defendants were not disinterested reporters of it but the concealed source of its contents.

148. The campaign was retaliation for protected activity. Defendants published and republished these statements because Plaintiff reported Shen Yun to federal authorities for suspected human trafficking, because he gave a public platform to former performers describing indoctrination, abuse, trauma, and suicide attempts, and because that reporting contributed to sustained national press coverage, to federal forced-labor litigation. Defendants published in order to discredit Plaintiff so thoroughly that neither he nor any other witness to the performers' treatment would be believed. Each republication renewed that retaliatory purpose.

149. It was reasonably foreseeable, and intended, that Defendants' statements would be repeated and amplified by affiliated media organizations and third parties in multiple languages and forums, and Defendants are liable for such foreseeable republication.

150. As a direct and proximate result, Plaintiff suffered damages including continuing reputational destruction, loss of professional opportunities and income, the reasonable costs of

counteracting and correcting the false statements, and severe emotional distress with physical manifestations, in an amount to be proven at trial.

**COUNT III**

**Intentional Infliction of Emotional Distress**
**(against Shen Yun, The Epoch Times, NTD, Xu, Browde, and Dragon Springs)**

151. Plaintiff restates and realleges the foregoing paragraphs as if fully set forth herein.

152. Defendants intended to inflict emotional distress on Plaintiff, or knew or should have known that emotional distress was the likely result of their conduct: hunting for the home address of a survivor of nearly a decade of imprisonment and torture, and then, after armed federal agents had already been sent to his door on the strength of Shen Yun's accusations, publicly branding him for years as an "armed and dangerous" threat and a foreign agent of the very regime that imprisoned and tortured him.

153. Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. It is made more so by its purpose: to retaliate against a man for reporting the suspected trafficking and abuse of children and for giving the performers' accounts a public hearing, and to frighten others into silence. That conduct was extreme and outrageous wholly apart from any religious pronouncement, practice, or belief—none of which Plaintiff asks this Court to evaluate: broadcasting an armed-and-dangerous accusation against such a man for years, and branding him an agent of his torturers, would be beyond all bounds of decency whoever did it and whatever their creed.

154. Defendants' conduct caused Plaintiff severe emotional distress, of a nature that no reasonable person could be expected to endure, accompanied by physical manifestations and culminating in his inability to work and medical leave beginning in approximately September 2025.

155. Plaintiff is entitled to damages in an amount to be proven at trial.

**COUNT IV**

**Massachusetts Civil Rights Act, G.L. c. 12 §§ 11H–11I**
**(against All Defendants)**

156. Plaintiff restates and realleges the foregoing paragraphs as if fully set forth herein.

157. Plaintiff exercised and enjoyed rights secured by the Constitution and laws of the United States and of the Commonwealth of Massachusetts, including his right to speak and to publish on matters of public concern, his right to report suspected crimes to law enforcement and to petition the government, and his right to assist others in vindicating their own rights to be free from forced labor, involuntary servitude, and trafficking.

158. Defendants interfered with, and attempted to interfere with, the exercise and enjoyment of those rights by threats, intimidation, and coercion. Persons acting in concert with Defendants hunted for Plaintiff's home address. Defendant Zhang relayed the order to delete published interviews of him, and the movement's media enforcers, acting in concert with Defendants, punished the journalist who had conducted them and cut her off from the community's commerce. And they publicized for years the Bulletin, obtained on the strength of Shen Yun's accusations, as proof that Plaintiff was an "armed and dangerous" foreign agent, in a community in which such a designation invites ostracism and worse, and after it had already brought armed officers to his door. Defendants' coercion thus operated in every register the Act reaches: physical, in the hunt for his home and the invocation of a document that had already produced an armed confrontation there; moral, in the public branding just described; and economic, in the destruction of Plaintiff's livelihood and of the commerce of those who supported him. None of these means was lawful.

159. Defendants' interference was not confined to speech. It included an organized effort—undertaken by Zeng Yong and others acting in concert with Defendants—to locate Plaintiff's home address through channels that bypassed his publicly available contact information; and the coercive economic punishment of third parties—including the September 2023 deletion order relayed by Defendant Zhang described above, and Zeng's termination of the advertising and project cooperation of Simone Gao, a journalist who had given Plaintiff a platform—undertaken to isolate Plaintiff and to deter others from supporting him or repeating what the performers had reported. That journalist was thereafter also publicly expelled from the community. Plaintiff challenges no religious discipline and no membership decision; he pleads the expulsion solely as evidence of the campaign's purpose and of the announced price of standing with him.

160. Defendants' purpose was to compel Plaintiff to stop speaking and reporting, and to deter others from doing so. A person of ordinary firmness, who had already seen armed federal agents at his door, been prosecuted, and been shown that anyone who stood with him would be similarly defamed and expelled from the community, would be intimidated into silence.

161. As a direct and proximate result, Plaintiff suffered injury, and he is entitled to compensatory damages, injunctive and declaratory relief, and reasonable attorneys' fees and costs under G.L. c. 12 § 11I.

**COUNT V**

**Civil Conspiracy and Concert of Action**
**(against All Defendants)**

162. Plaintiff restates and realleges the foregoing paragraphs as if fully set forth herein.

163. Defendants, together with their affiliated organizations, acted pursuant to a common design and agreement to destroy Plaintiff's reputation and livelihood in retaliation for his protected activity, and to deter others from coming forward about the treatment of Shen Yun's

performers. At the hub of that design stood Shen Yun itself. It was Shen Yun's treatment of its performers that Plaintiff exposed; it was the Bulletin that Shen Yun's own accusations had produced that supplied the campaign's raw material; and it was for Shen Yun's protection and benefit that the campaign was conducted. Shen Yun conspired with the movement's media organs—Defendants The Epoch Times and NTD among them—and with Defendant Zhang, through whom, on information and belief, directives of the movement's founder concerning Plaintiff were relayed and enforced, with Defendant Xu, Dragon Springs' President and Shen Yun's campus spokesman, with Defendants Browde and the Information Center, and with Defendant Dragon Springs itself, through whose officers the campus-security accusations were made, and acted through and in concert with the movement's other affiliated outlets and organizations, including Vision Times, Sound of Hope, Minghui.org, and the Ganjing World platform.

164. Zhang was more than merely a messenger, however; he was a coordinator of this campaign. By the Information Center's own published staff listing, he serves as its Director of Government and Advocacy, and his acts to damage Mr. Yu's reputation were taken in that capacity, in furtherance of the Information Center's core function of managing public perception of the movement and of Shen Yun. Zhang's conduct and his knowledge are therefore attributable to the Information Center and to every Defendant that joined the common design.

165. In furtherance of that common design, and as described above: Shen Yun treated the Bulletin that its own accusations had produced as the campaign's foundation; Defendant Xu publicized and vouched for those accusations to the press; The Epoch Times converted the resulting Bulletin into a years-long publication campaign while concealing its source and deleting its own contrary coverage; Defendants Browde and the Information Center supplied the "foreign

agent" and "leaked documents" accusations, which Shen Yun adopted in its official statements; Defendant Zhang circulated the August 17, 2023 notice directing the community to disregard Plaintiff and, in the days before Shen Yun went to the FBI, relayed the order—attributed by him to Li Hongzhi—to delete published interviews of Plaintiff from the internet; Zeng Yong, acting in concert with Defendants, hunted Plaintiff's Massachusetts address in the days before the Bulletin issued and enforced the campaign by punishing practitioners who supported Plaintiff; and NTD, with The Epoch Times' participation and with Shen Yun's master of ceremonies on camera, consolidated the entire narrative into *Unbroken* and distributed it worldwide. Throughout, the affiliated outlets acting through and in concert with Defendants—Vision Times, Sound of Hope, Minghui.org, Ganjing World, and others—republished and amplified the same false accusations, in the same terms and on the same schedule, in furtherance of the common design and as its intended instruments; and Defendants, Shen Yun first among them, are jointly and severally liable for the harm those republications caused.

166. Each Defendant knew of the common design and its unlawful objects, acted with the specific intent to further those unlawful aims, and substantially assisted and encouraged the others' tortious conduct, including by supplying content to one another, citing and republishing one another's publications, appearing in one another's productions, and jointly promoting the resulting narrative. Each Defendant gave substantial assistance and encouragement to conduct it knew to be tortious, and the combined weight of Defendants' coordinated conduct—the exploitation of the Bulletin, the publication campaign, and the enforcement of community-wide shunning—accomplished what none could have accomplished alone.

167. As a direct and proximate result of Defendants' conspiracy and concerted action, Plaintiff suffered the damages described herein, and each Defendant is jointly and severally liable for the whole of the harm, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, as follows:

a. Awarding Plaintiff compensatory damages, including presumed damages, actual damages for reputational harm, emotional distress and physical harm, lost income and earning capacity, and special damages including mental healthcare costs and the reasonable costs, incurred and prospective, of corrective publication, in an amount to be determined at trial;

b. Awarding pre- and post-judgment interest as permitted by law;

c. Awarding Plaintiff injunctive relief pursuant to G.L. c. 12, § 11I, including an order requiring Defendants to remove from all websites, platforms, and channels under their ownership or control, and to retract, the false and defamatory publications concerning Plaintiff identified herein;

d. Awarding continuing or supplemental damages for each day following entry of judgment that any Defendant continues to publish, or fails to remove from platforms under its ownership or control, any publication adjudicated defamatory herein, so that Plaintiff is not required to commence successive actions to remedy ongoing republication;

e. Awarding Plaintiff his costs of suit and his reasonable attorneys' fees to the extent permitted by law, including under G.L. c. 12 § 11I;

f. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: October 16, 2026

Respectfully submitted,

CHAO YU,

By his attorneys,

/s/ *Megan A. Siddall*
Megan A. Siddall (BBO # 568979)
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
(617) 481-0160
msiddall@clohertysteinberg.com

Brian Brook (pro hac vice forthcoming)
Qian Liu Brook (pro hac vice forthcoming)
BROOK & ASSOCIATES, PLLC
459 W 18th St, Fl 9
New York, NY 10011
(212) 256-1957
brian@brook-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2026, this document was filed through the ECF system and will be sent electronically to the registered participants, as identified on the Notice of Electronic Filing.

/s/ *Megan Siddall*
Megan Siddall